No. 32,924

THE STATE OF KANSAS, *Appellee*, v. JIM HOGGARD, *Appellant*.

(68 P. 2d 1092)

Opinion filed June 12, 1937.

*Hal C. Davis,* of Topeka, for the appellant.

*Clarence V. Beck,* attorney general, and *Lester M. Goodell,* of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment and sentence for the crime of grand larceny.

The state charged and its evidence tended to prove that Jim Hoggard and one Jack Miller conspired to and did steal $600 from Ernest Wulfkuhle, a farmer who resided near Big Springs. Defendant and one Ketchum called at Wulfkuhle's farm and told him they were seeking a pasture for three race horses, that the father of defendant owned the horses and would pay $5 per day for their keep. Wulfkuhle agreed to keep the horses on those terms, and defendant told him to come to the Throop Hotel in Topeka the next day to sign the pasture contract with defendant's father. Next day Wulfkuhle came to the hotel. Ketchum was on the outlook for him, and showed him to a room where defendant and Jack Miller invited him to play cards. He said he did not understand the game. Ketchum volunteered to assist him. After some time there was a telephone call, apparently a spurious one, which pretended to convey the news that the truck which was supposed to be bringing the race horses from Kansas City had broken down near Perry, and that the arrival of the horses would be delayed. On the assurance that Ketchum would coach him, Wulfkuhle participated in a pretended game of stud poker, which was apparently played by dealing five cards, one at a time, to each of the players. The players privately inspected the first card dealt and laid it face down on the table. Ketchum had seen Wulfkuhle's first card and when three more cards had been dealt face up to the players Ketchum assured Wulfkuhle that he already had an unbeatable hand. After some discussion, Wulfkuhle was persuaded to go with Ketchum to Lawrence and get $600 in cash to bet on this unbeatable hand. To preserve the *status quo* until that journey was taken Wulfkuhle's hand was sealed in one envelope, Jack Miller's hand in another, and the remainder of the deck in a third; and Ketchum, the adviser of Wulfkuhle, took charge of the three sealed envelopes. When Wulfkuhle and Ketchum returned from Lawrence with the money, and the hands were shown, Miller's hand was the stronger. He took the money, and he and defendant immediately disappeared. Ketchum made some remark about seeing the victim some time later, and followed the others. Such was the culmination of the pretended hunt for a pasture for race horses which apparently never

existed, but which served to scrape up an acquaintance with a farmer who naturally enough would be pleased to get $5 per day for pasturing three race horses.

The state's evidence also tended to show that the real name of Ketchum was Roy Hoggard and that he was a brother of defendant. The trio, defendant, Miller and Ketchum, were arrested a few days later in St. Joseph, Mo.

Touching the errors relied on to reverse the judgment, defendant first complains of the overruling of his motion for a continuance on account of the absence of Miller and Ketchum who, he averred, were important witnesses in his behalf. Neither the abstract nor brief gives any intimation about what evidence they would have given if their presence had been procured. The trial was had between December 12 and December 16, 1935. The motion for a new trial was not argued until January 4, 1936, twenty days after the verdict was rendered; but even at that late date defendant made no showing that if Miller and Ketchum had been present, their evidence, or the evidence of either, would probably have brought about a different verdict, or at least might have averted a verdict of guilty. Moreover, this defendant was arrested in July, and was bound over for trial in October. His trial was set for December 12, and all the record shows as to his diligence in procuring the attendance of these witnesses is that on the day before the trial he received two telegrams. One of these was from the wife of Jack Miller, which stated that she had received a letter from Jack, mailed in St. Louis, that he was on his way to Detroit, but would be in Topeka for the trial. If any significance were to be given to that telegram, it would be that no continuance would be necessary. And while Miller failed to arrive according to his letter, even twenty days later no explanation of his absence was forthcoming. The other telegram was from a woman who managed a hotel in Kansas City, which read: "Ketchum stayed here, been gone two weeks, baggage still here."

No court would be justified in postponing an important criminal trial on such a slim showing of diligence to procure the attendance of witnesses, or on such manifest uncertainty as to their later appearance if a continuance were granted, especially when the state had summoned its witnesses and had made preparation to try the case on the date set.

The next error is based on the contention that the facts charged in the information did not constitute a public offense. It is argued

that the winning of money on a poker game is neither grand nor petit larceny, which is true, of course (*State v. Terry*, 141 Kan. 922, 44 P. 2d 258); but the state's theory was that the prosecuting witness was deprived of his money by means of a pretended poker game, which was quite a different affair from a game of cards where men risk their money partly on their skill and partly on the elements of chance. Gullible men have often been robbed of their money and property on simulated games of chance or skill, or both, on simulated card games, simulated foot races, simulated horse races. To deprive a man of his money by such means is uniformly regarded as larceny. In *State v. Flaherty*, 103 Kan. 393, 173 Pac. 919, the defendant was convicted of the larceny of a large sum of money from the prosecuting witness by inducing him to bet on a pretended horse race. This court affirmed the judgment, quoting with approval an excerpt from 17 R. C. L. 16, where it is said:

" 'Obtaining money under the pretense that it is to be bet on a race, and with the intent at the time to convert it to the bailee's own use, the race being a mere sham to aid this purpose, is larceny.' "

In the opinion the court cited *Doss v. The People*, 158 Ill. 660, 41 N. E. 1093, where the conviction of a defendant for the crime of larceny committed by the means of a fake foot race was reviewed and affirmed. The first section of the syllabus sufficiently states the case for present purposes:

"Obtaining possession of money for the pretended purpose of making a wager for the owner's benefit on a sham race, which is so carried out that the owner is declared to have lost the wager, constitutes larceny, when the owner did not intend to part with the title, but merely with the possession of his money, and it was obtained from him with intent to convert it."

Another case cited in this court's opinion in *State v. Flaherty*, supra, is *State v. Dobbins*, 152 Ia. 632, 132 N. W. 805, 42 L. R. A., n. s., 735 and note, where it was held that one who induces another to put up his money on a pretended horse race, for the purpose of getting others to bet, under the promise that it would be returned as soon as it has served its purpose, but in reality with the intent of the stakeholder to convert it to the use of several coconspirators, including the promisor, is, if the intent is carried out, guilty of larceny. In the opinion an early Michigan case, *People v. Shaw*, 57 Mich. 403, 24 N. W. 121, was quoted with approval, thus:

"We do not think it profitable to draw over-nice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's

money by such tricks as those which were played here, it is not going beyond the settled rules of law to hold that fraud will supply the place of trespass in the taking and so make the conversion felonious."

The error based on the insufficiency of the information cannot be sustained.

It is next urged that the trial court erred in admitting evidence which tended to show that some time prior to the commission of the offense charged against this defendant, Harry Ketchum had approached David Cunningham, a farmer who resided near Meriden, and offered him $5 per day to pasture three race horses owned by his father. Cunningham accepted this offer. Ketchum wanted him to come to Topeka and sign a contract to that effect, but he refused to do so. He did, however, make a mental note of the license number of Ketchum's automobile. Other evidence objected to tended to show that defendant and Jack Miller called on Charley Bigham, a farmer who resided near Grantville. They told him they were looking for a place to pasture three race horses belonging to defendant's father, and that he would pay $3 per day. Although Bigham declined the offer, they urged him to come to Topeka next day and sign a contract. Defendant's objection to this line of testimony was overruled; but in its instructions the trial court limited its evidential significance to the matter of identifying the three persons, Jim Hoggard, Harry Ketchum alias Roy Hoggard, and Jack Miller, who participated in the scheme whereby Wulfkuhle was deprived of his $600. So limited, the evidence was clearly admissible. Perhaps the significance of this evidence was rather narrowly restricted, but that question is of no present consequence.

Error is also urged on the refusal of the trial court to instruct the jury that it is not a felony to play a poker game; and that if the prosecuting witness played a game of poker with defendant and his associates and had a chance to win, defendant should be acquitted. What the trial court did do was to tell the jury what the specific charge was, as detailed in the information. The court next explained to the jury the distinction between grand larceny and petit larceny. Next, in instruction No. 2, the court stated at length the gravity of the offense—penal servitude for grand larceny, and a fine or jail sentence or both for petit larceny. Then the court gave instruction No. 3 as follows:

"If you find and believe from the evidence beyond a reasonable doubt that the defendant, Jim Hoggard, did feloniously steal, take or carry away the

personal property described in the information in this case, or some part thereof, by the means and in the manner alleged in the information, and within the meaning of instruction No. 2, then you should find the defendant guilty of larceny, *but unless you do so find and believe beyond a reasonable doubt, you should acquit the defendant of the charge of larceny*. If you find the defendant guilty of larceny, you should fix the value of the property taken in your verdict." [Italics ours.]

Instruction No. 4 as given, in part, reads:

"In this case, if you find from the evidence that the defendant did not himself, or in connection with others, commit the offense charged in the information, but you further find beyond a reasonable doubt that he did counsel, aid, abet or assist another or others in committing the offense, then I say to you that he would be as guilty as though he had actually committed the offense, and you should so find. If he committed the offense as charged, acting in connection with others, he would be as guilty as though he acted alone or by himself."

The other instructions fully covered the presumption of defendant's innocence, the burden which rested on the state to prove every material allegation of fact contained in the information to the jury's satisfaction beyond a reasonable doubt; and that it was the duty of the jury to acquit the defendant "*if you entertain a reasonable doubt upon any single fact or element necessary to constitute the crime charged, it is your duty to give the defendant the benefit of such doubt and acquit him.*"

In *State v. Phillips*, 136 Kan. 407, 15 P. 2d 408, the defendant was convicted on a charge of robbery, and assigned error on the fact of the trial court's failure to instruct on the offense of being an accessory after the fact. This court said:

"The offense of being an accessory after the fact is defined by the statute (R. S. 21-106), and is a separate and distinct offense. It is no part of any other offense nor is it any degree of any other offense. (*State v. Stoy*, 117 Kan. 124, 230 Pac. 335.) Consequently it was not included in the crime charged in the information. An instruction concerning an offense that is not charged in the information on which the defendant is being tried is improper, and it is not error for the court to refuse to give such instruction. (*State v. Hobl*, 108 Kan. 261, 194 Pac. 921.) If the evidence was insufficient to support the offense charged in the information or an offense included therein, the defendant should have been discharged. He cannot be tried for an offense not included in the information." (p. 410.)

And so here. The instructions as given were complete and sufficient. The offense charged was not that of the playing of a poker game for money. The trial court's refusal to instruct on the criminal features of a game of poker is nothing more than a talking point in

this appeal. It did not affect the substantial rights of the defendant in the slightest degree; and the mandate of the criminal code, G. S. 1935, 62-1718, forbids this court to disturb the judgment in the light of this entire record.

A patient study of this record and of the brief and argument of defendant's counsel reveals nothing approaching the gravity of reversible error. The judgment is therefore affirmed.